# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARK MELMAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08-cv-01205** |
| | ) | **JUDGE HAYNES** |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## M E M O R A N D U M

Plaintiff, Mark Melman, filed this action under the Americans with Disabilities Act, 18 U.S.C. § 12101, et seq. ( "ADA") and the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq. ("RHA") against the Defendant, Metropolitan Government of Nashville and Davidson County, his employer. Plaintiff contends that the Defendant discriminated against him based upon his disability by switching the Plaintiff from bus driver to bus monitor. Specifically, Plaintiff alleges that Defendant failed to comply with applicable United States Department of Transportation ("DOT") regulations, refused to make a reasonable accommodation of the Plaintiff's disability through alternative methods of urine testing; and failed to engage in the interactive process.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 38), and memoranda in support thereof, (Docket Entry Nos. 39, 68), to which Plaintiff has responded. (Docket Entry Nos. 46, 69). Defendant's motion asserts, in sum: (1) the Defendant has an absolute defense to Plaintiff's ADA or RHA claims because the challenged employment decision was required or necessitated by another federal law or regulation; (2) that the Plaintiff's proposed

1

"reasonable accommodation" would require the Metropolitan Government to violate DOT regulations and is therefore unreasonable; and (3) that the Plaintiff is unqualified to perform the requirements of a school bus driver with or without a reasonable accommodation.

Plaintiff responds that the Defendant did not comply with all DOT regulations in switching the Plaintiff from bus driver to bus monitor. Plaintiff disputes that the applicable DOT regulations do not permit the accommodation sought. Plaintiff contends that the Defendant's conduct in violation of the ADA and the RHA was the cause of the Plaintiff inability to remain qualified to operate a bus. Plaintiff further responds that Defendant was not required to adopt the MRO's medical determination.

## I. Findings of Fact[1]

Plaintiff was employed by Metropolitan Nashville Public Schools ("MNPS") as a school bus driver in 2002. (Docket Entry No. 38, Attachment No. 1, Compl. ¶ 11). As a school bus driver, Plaintiff was in a "safety-sensitive position." Because of this position, Plaintiff was required to submit to a pre-employment drug screen and random, unannounced drug screens arranged by MNPS. (Docket Entry No. 38, Attachment No. 1, Compl. ¶ 12).

On February 25, 2008, Plaintiff was selected for a random drug test and reported to the drug screening collection site at AEGIS Laboratories. (Docket Entry No. 42, Attachment No. 1,

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46(6th Cir. 1986). As discussed infra, upon a filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Under the applicable law and the parties' factual submissions, the Court concludes that there are not any material factual disputes. From the Court's perspective, the parties' purported factual disputes are actually challenges to the probative value and effects of undisputed facts. Thus, this section

2

Melman Deposition at 46-48).  At the test facility, Plaintiff attempted to provide a urine sample

in the bathroom.  Id. After several failures to supply an adequate sample, Plaintiff was instructed

to drink water.  Id. Plaintiff was given three hours to produce a urine sample at the facility.  Id.

After three hours had lapsed without Plaintiff producing an adequate sample, Plaintiff was told to

report to the MNPS Transportation Division Offices.  (Docket Entry No. 42, Attachment No. 1,

Melman Deposition at 48-53).  There, Plaintiff met with his supervisor who instructed him to

receive a DOT medical evaluation.  Id.  At the DOT physical, Plaintiff could still not produce a

urine sample.  Id. at 72.

On March 6, 2009, Marilyn Holloman, Human Resources Director of Transportation for

MNPS, referred Plaintiff to Dr. Mitchel Wiatrak.  Id. at 56-57.  Dr. Wiatrak, a board certified

urologist, evaluated Plaintiff's inability to provide sufficient sample for his February 25, 2008

random drug test.  (Docket Entry No. 34, Attachment No. 4, Wiatrak Deposition at 5-7).  At the

evaluation, Dr. Wiatrak completed a form provided by MNPS titled "Recommendation to

Medical Review Officer by Physician Performing Shy Bladder Evaluation."  Id. at 10.  Dr.

Wiatrak checked part 1 noting that "[a] medical condition has, or with a high degree of

probability could have, precluded the donor from providing a sufficient amount of urine."  Id.

Dr. Wiatrak also noted in the available space that "pt [patient] has bashful bladder by clinical

presentation.  There is no testing to confirm this.  I am willing to catheterize him in the office to

obtain a specimen if you provide the kit."  Id. (emphasis added).  Dr. Wiatrak based his

recommendation entirely on patient history.  Id.  Dr. Wiatrak did not find any physiological

---

constitutes findings of fact under Fed. R. Civ. P. 56(d).

3

reason preventing an adequate sample and rested his diagnosis on an oral history of "bashful bladder," a recognized psychological disorder. Id. at 13-14.

Dr. Stephen Kracht was the Medical Review Officer ("MRO") for Plaintiff's February 25, 2008 random drug test. (Docket Entry No. 38, Attachment No. 3, Kracht Deposition at 54-61). On March 26, 2008, Dr. Kracht reviewed the form completed by Dr. Wiatrak during Plaintiff's evaluation. Id. at 37-38. Dr. Kracht found that Dr. Wiatrak did not point to any previously medically documented psychological disorder and thereby rejected Dr. Wiatrak's recommendation. Id. At 3:30 PM on March 26, 20008, Dr. Kracht verified Plaintiff's February 25, 2008 random drug test as a "refusal to test." Id.

Plaintiff filed a grievance, and Dr. June Keel, Assistant Superintendent of Human Resources at MNPS, conducted a hearing on March 26, 2008. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 74-75). Plaintiff's grievance alleged that drug testing procedures were not followed and that he was forced to pay from his personal funds for Dr. Wiatrak's evaluation. (Docket Entry No. 38, Attachment No. 5, Keel Deposition at 26). Plaintiff sought to void the February 25, 2008 random drug test and to require all future testing to be done by blood test or catheterization. Id. At the hearing, Plaintiff described his shy bladder condition that he asserted to be protected under the ADA. (Docket Entry No. 38, Attachment No. 5, Keel Deposition at 18-20). Mary Eady, Cheryl Gentry, and Jim Buckley, United Steelworker's Union representatives, attended the hearing with Plaintiff. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 74-75). The participants discussed alternative means of drug testing for Mr. Melman. Id.

On April 18, 2008, Dr. Keel and Plaintiff had a second meeting. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 27). At this meeting, Dr. Keel placed Plaintiff on administrative leave for the remainder of the school year. Id. Dr. Keel also informed Plaintiff that to return to his job as a bus driver, he would have to complete a substance abuse awareness program. Id. at 77-78. Plaintiff agreed, under protest, to enroll in the substance abuse program. Id. Dr. Keel instructed Plaintiff to contact John Edwards, a Substance Abuse Professional ("SAP") with the Metro Employee Assistance Program ("EAP"). Id. at 78-81. Edwards referred Plaintiff to an alcohol and drug program that was approximately 12 hours long. Id. Plaintiff attended this program. Id. To complete the return to work procedures, Plaintiff needed to contact Mr. Edwards, pay for the 12 hour program, and submit to a drug test. Id. Plaintiff failed to complete the final steps of the return to work procedures. Id.

In May 2008, Dr. Kracht received additional information provided by Plaintiff from Robin Dunn at Workforce Essentials. (Docket Entry No. 38, Attachment No. 3, Kracht Deposition at 57). The information contained a May 7, 2008 letter from Dr. Heusinkveld (Plaintiff's personal physician) and attached doctor's note from Dr. Faber (a urologist Plaintiff saw on his own after the February 25 drug test. Id. Dr. Kracht did not find any evidence of a pre-existing psychological disorder that would have prevented Plaintiff from producing an adequate sample on February 25, 2008 after his conversation with a nurse from Dr. Faber's office. Id. at 57-61. On June 27, 2008, Dr. Kracht sent a letter to Jo E. Patterson, MNPS's Human Resources Director, explaining his initial verification of Plaintiff's February 25, 2008 test as a refusal to test and why the later information did not change his decision. Id. at 43. In the letter, Dr. Kracht cited the relevant DOT regulations and explained that the lack of medical

5

evidence in the reports from three different doctors of Plaintiff's condition led to his verification

of Plaintiff's February 25, 2008 drug test as a refusal to test.  Id.

In the fall of 2008, Plaintiff returned to work as a school bus monitor on a special

education route.  (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 27).  Plaintiff

currently has not completed the necessary steps to return to work as a school bus driver. Id. at

78-81.

## II.  Findings of Law

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme

Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary
> judgment 'shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law.'  By its very terms, this standard
> provides that the mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material.  Only
> disputes over facts that might affect the outcome of the suit under the governing
> law will properly preclude the entry of summary judgment.  Factual disputes that
> are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part).  Earlier the Supreme Court

defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).  Where there has been a reasonable

opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment.  Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989).  But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards."  Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986).  The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact.  Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)).  "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'"  Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citations

7

omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> *      *      *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it. upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.

8

It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d. 43, 46 (6th Cir. 1986) (citation omitted).

In <u>Street</u>, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily appropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the "scintilla rule" applies, <u>i.e.</u>, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the

9

substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## A. ADA and RHA Claims

Plaintiff asserts disability discrimination claims under the ADA and RHA. The ADA provides that covered entities shall not discriminate against a qualified individual because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

10

employment." 42 U.S.C. § 12112(a). The Rehabilitation Act prohibits discrimination against an "otherwise qualified handicapped individual, solely by reason of his handicap." Pesterfield v. Tenn. Valley Auth., 941 F.2d 437, 441 (6th Cir. 1991) (citing 29 U.S.C. § 794; Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 626 (1984)). Claims brought under the ADA and Rehabilitation Act may be analyzed together. Thompson v. Williamson County, Tenn., 219 F.3d 555, 557, n.3 (6th Cir. 2000). "By statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination." Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002) (citation omitted).

To establish a prima facie claim of employment discrimination under either Act a plaintiff must show (1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable discrimination, and (3) who was discriminated against solely because of the disability. Id. (citations omitted)

The Defendant asserts that (1) the Defendant has an absolute defense to an ADA or Rehabilitation Act claim because the challenged employment decision was required or necessitated by another Federal law or regulation; (2) that the Plaintiff's proposed "reasonable accommodation" would require the Metropolitan Government to violate DOT regulations and is therefore unreasonable; and (3) that the Plaintiff is not qualified to perform the requirements of a school bus driver with or without a reasonable accommodation. The Court agrees with all three assertions and thereby grants the Defendant's motion for judgment as a matter of law.

### 1. ADA and Rehabilitation Act Defense

Regulations under the ADA and Rehabilitation Act provide a legal defense for employers to disability claims if the "challenged action is required or necessitated by another Federal law or

regulation." 29 C.F.R. § 1630.15(e). "The admittedly few courts that have considered this provision have accepted it as a complete defense to an ADA claim, as long as the defendant could show that the action was, in fact, required by another Federal law." E.E.O.C. v. Murray, Inc., 175 F. Supp. 2d 1053, 1066 (M.D. Tenn. 2001).

MNPS is required by 49 C.F.R. § 40.1 to perform random drug tests on its employees performing safety-sensitive duties, such as operating school buses. On February 5, 2010, Mr. Melman was randomly selected to take a drug test and reported to AEGIS Laboratories. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 46-48). Upon initial request, Plaintiff was unable to provide the requisite amount of specimen to satisfy the DOT requirements. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 46). When an employee is unable to produce an adequate sample, the "Shy Bladder" regulation, 49 C.F.R. § 40.193 applies. § 40.193 provides that a test collector should discard the insufficient specimen and allow the employee to drink up to 40 ounces of liquid and three hours to provide a sufficient urine specimen. 49 C.F.R § 40.193(b)(1)-(2). If three hours pass and the employee is still unable to provide an adequate sample, the collector must discontinue the collection and notify the employer and MRO. 49 C.F.R. § 40.193(b)(4)-(5). When Plaintiff was unable to provide an adequate sample after three hours, AEGIS Laboratories reported Plaintiff's inability to MNPS and Dr. Kracht, the MRO. (Docket Entry No. 42, Attachment No.1, Melman Deposition at 47-51)

Upon notice of an employee's inability to produce an adequate sample, an employer must direct its employee to obtain within five days an evaluation from a licensed physician with expertise in the medical issues raised by the employee's inability to produce sample. 49 C.F.R §

12

40.193(c). The record shows that MNPS referred Plaintiff to Dr. Wiatrak where he received an evaluation ten days after his random drug test. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 56-57).

Here, Plaintiff asserts that because Plaintiff was not referred to a qualified licensed physician in five days, but rather ten days, that the Defendant was not acting in compliance with Federal law and therefore cannot assert the § 1630.15(e) defense. The Court disagrees. Section 40.193(c) requires the employee to obtain an evaluation from a licensed physician, not the employer. An employee's failure to receive an evaluation in five days does not make an employer non-compliant with the DOT regulations. Neither was the five day period meant to be a firm deadline. The DOT recognizes that employees might be unable to secure an appointment with a qualified urologist within five days of a shy bladder incident. Procedures for Transportation Workplace Drug and Alcohol Testing Programs, 65 Fed. Reg. 79462-01, 79501 (Dec. 10, 2000). As long as the employee made a good faith effort to secure an appointment, the DOT is satisfied. Id. The DOT does recommend that the employer and the MRO do "everything feasible in finding and getting an appointment with an appropriate referral physician." Id. However, the Plaintiff has not presented evidence of deliberate stalling by the Defendant in securing Plaintiff an appointment with a licensed physician. The ten day period between Plaintiff's random drug test and his evaluation by Dr. Wiatrak satisfies § 40.193(c).

After the evaluation, the licensed physician must recommend the MRO determine either that "[a] medical condition that has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of urine," or that "there is no adequate basis for determining that a medical condition has, or with a high degree of probability could have,

13

precluded the employee from providing a sufficient amount of urine." 49 C.F.R. § 40.193(d).  A

medical condition "includes an ascertainable physiological condition or a medically documented

pre-existing psychological disorder." 49 C.F.R. § 40.193(e).  The MRO must "seriously consider

and assess" the referral physician's recommendation before determining whether the medical

condition satisfies § 40.193(e).  49 C.F.R. § 40.193(h).  If the MRO accepts the medical

condition as valid, the test is cancelled. 49 C.F.R. § 40.193(d)(1)(i).  A cancelled test results in

the subject being returned to the random testing pool with no effect on his employment.  49

C.F.R. § 40.193(h)(i).  If the MRO rejects the physician's recommendation that a medical

condition exists, or the physician finds no medical condition, the MRO reports the result as a

refusal to test.  49 C.F.R. §§ 40.193(d)(2)(i), 40.191(a)(5).  A refusal to test requires removal

from safety-sensitive duties.  49 C.F.R. §§ 655.49(a), 655.61(a)(3).

Plaintiff received an evaluation from Dr. Wiatrak, a licensed urologist, on March 6, 2010.

(Docket Entry No. 38, Attachment No. 4, Wiatrak Deposition at 5-7).  On a form given to him by

MNPS, Dr. Wiatrak noted that his recommendation was that "[a] medical condition has or with a

high degree of probability could have, precluded the donor from providing a sufficient amount of

urine."  (Docket Entry No. 38, Attachment No. 4, Wiatrak Deposition at 10).   Additionally, Dr.

Wiatrak noted, "pt [patient] has bashful bladder by clinical presentation.  There is no testing to

confirm this.  I am willing to catheterize him in the office to obtain a specimen if you provide the

kit."  Id. (emphasis added).  As previously stated, a medical condition sufficient under §

40.193(e) to result in a cancelled test must be physiological or a previously documented

psychological condition.  "Shy Bladder" is not a physiological condition, but rather an accepted

psychological disorder.  Id. at 8-9.  Here the MRO determined that there was no previous

14

medical documentation of Plaintiff's "Shy Bladder." (Docket Entry No. 38, Attachment No. 3, Kracht Deposition at 37-38). Plaintiff is correct in pointing out that discretion is vested in the evaluating physician to diagnose if the employee has a psychological condition, but only if there is pre-existing medical documentation of the condition. 65 Fed. Reg. 79642, 79501 ("[I]t is not necessary that the condition be diagnosed before the time of the test, but the symptoms have to have been medically documented before the time of the test."). This diagnostic discretion relates to the physician's recommendation, the MRO still maintains discretion to disagree with the evaluating physician's determination. 62 Fed. Reg. 16370-01, 16374. Defendant has shown, and plaintiff has failed to refute, that the procedures followed for Plaintiff February 25, 2008 random drug test and subsequent removal from safety-sensitive duties were mandated by DOT regulations. Defendant can thereby avail itself of the complete defense offered by § 1630.15(e).

Plaintiff contends that there is a genuine issue of material fact over whether Dr. Kracht seriously considered the recommendation. The Court disagrees. Plaintiff's assertion that Dr. Kracht did not seriously consider Dr. Wiatrak's recommendation because he did not speak directly to Plaintiff or Dr. Wiatrak lacks support. Section 193(h) requires Dr. Kracht to seriously consider the evaluating physician's report, and no other source. The regulation does not require Dr. Kracht to review previous tests where Plaintiff presented with a "Shy Bladder," nor consider later evaluations of Plaintiff by other doctors. 49 C.F.R § 40.193(h). In fact, Dr. Kracht is precluded from considering information presented on Plaintiff's condition collected outside the drug testing procedure in § 40.193. 49 C.F.R. § 40.151 et. seq. Dr. Kracht's evaluation of the reports from Dr. Huesinkveld and Dr. Faber was outside his authority and ultimately could not have been used to overturn his verification of Plaintiff's random drug test as a refusal to test.

15

See id. No pre-existing medical documentation of a "Shy Bladder" was presented to Dr. Wiatrak or Dr. Kracht at the time of their evaluations. (Docket Entry No. 38, Attachment No. 3, Kracht Deposition at 37-38, Attachment No. 4, Wiatrak Deposition at 8-10). Dr. Kracht considered Dr. Wiatrak's recommendation, but without pre-existing medical documentation of Plaintiff's "Shy Bladder," Plaintiff's condition could not satisfy the requirements of § 193(e). (Docket Entry No. 38, Attachment No. 3, Kracht Deposition at 29-30). The Court does not find a genuine issue of material fact on whether Dr. Kracht "seriously considered" Dr. Wiatrak's recommendation because Dr. Kracht reached the decision that § 193(e) obligated him to make, that Plaintiff did not have a previously medically documented psychological disorder at the time of the evaluation.

Plaintiff further asserts that Defendant's failure to remove him immediately from safety-sensitive activities after receipt of his test result violated DOT regulations and therefore demonstrates a genuine issue of material fact over whether MNPS was in fact required to comply with DOT regulations. The Court disagrees. It is undisputed that MNPS is covered by the DOT drug testing regulations. See 49 CFR §§ 382.103, 40.1. MNPS's actions, outside of its internal grievance procedures, were all mandated by DOT regulations. That MNPS did not remove Plaintiff from his safety-sensitive duties for twenty three days after receiving a verified refusal to test result from Dr. Kracht is immaterial. For twenty three days, MNPS violated DOT regulations in allowing Plaintiff to drive a city school bus with a drug test verified as a refusal to test. (Docket Entry No. 38, Attachment No. 4, Wiatrak Deposition at 37-38). The subsequent placement of Plaintiff on administrative leave on April 18th brought MNPS into compliance with DOT regulation. (Docket Entry No. 42, Attachment No. 1, Melman Deposition at 25, 27). MNPS's required compliance with DOT regulation was never at issue.

Finally, Plaintiff contends, based on 49 C.F.R. § 40.355(i), that the employer has a non-delegable duty to determine whether a refusal to test occurred. This reading of the DOT regulations would preclude MNPS from asserting the defense in 29 C.F.R. § 1630.15(e). MNPS's decision to consider the testing result a refusal to test, without reasonable accommodation, would not be protected by 29 C.F.R. § 1630.15(e) because MNPS's decision would not be mandated by federal law. However, Plaintiff misreads the relevant DOT regulations.

Specific grants of authority should be read to supersede general limitations. Sprague v. Gen. Motors Corp., 133 F.3d 388, 405 (6th Cir. 1998) ("As a matter of statutory construction, a specific statutory provision governs a general one."). Statutory canons of construction apply with equal force to interpreting regulations. See Mekulsia v. C.I.R, 389 F.3d 601, 605 (6th Cir. 2004). Under § 40.193(h), the MRO determines whether there was an adequate medical explanation for the employee's failure to provide an adequate sample. If the MRO determines that there is no valid explanation, the failure to provide an adequate sample is defined as a refusal by 49 C.F.R. § 40.191(a)(5). Neither the MRO nor the employer has any discretion to decide whether the failure to provide adequate sample is a refusal to test. The regulatory framework mandates this result once the MRO determines the lack of adequate medical explanation for the employee's failure to provide adequate sample. See 49 C.F.R. §§ 40.193(h), 40.191(a)(5), 382.211. Medical determinations such as this one are under the "sole authority" of the MRO. 49 C.F.R. § 149(c). After the MRO determines the absence of an adequate medical explanation for Plaintiff's failure to provide adequate sample, §§ 40.191(a)(5) and 382.211 require MNPS to consider Plaintiff's random drug test a refusal to test.

17

As to Plaintiff's requested accommodation, if such requests violate DOT regulation, the requests are unreasonable as a matter of law. Requested accommodations that require a party to violate federal law cannot be reasonable. See e.g. E.E.O.C. v. Allendale Nursing Centre, 996 F. Supp. 712, 718 (W.D. Mich. 1998). Here, Plaintiff's requested accommodation of catheterization or alternative drug testing are not allowed by DOT regulations. See 49 C.F.R. §§ 40.61(b)(3), 40.151(a). Catheterization is expressly prohibited to collect urine samples unless the employee normally voids by catheter. 49 C.F.R. § 40.61(b)(3) ("You must not collect, by catheterization or other means, urine from an unconscious employee to conduct a drug test under this part. Nor may you catheterize a conscious employee. However, you must inform an employee who normally voids through self-catheterization that the employee is required to provide a specimen in that manner."). Neither can an MRO consider alternative tests to comply with DOT regulations. 49 C.F.R. § 40.151(a).

Plaintiff correctly asserts that § 40.195(a)(3) allows for alternatives to urine testing when an employee fails to provide an adequate sample, but this section is not implicated here. Section 40.195 applies only to "pre-employment, follow-up, or return-to-duty testing." 49 C.F.R. § 40.195. Plaintiff's inability to provide adequate sample occurred during a random drug test that is covered under § 40.193. (Docket Entry No. 38, Attachment No. 1, Complaint at ¶ 14). The DOT declined to apply § 40.195 to random drug testing because the possibility of cancelling a random drug test is sufficient to accommodate medical conditions that prevent urination. 65 Fed. Reg. 79642-01, 79501. The ability for an employee with a valid medical reason for his inability to provide a sufficient sample to have his test cancelled and resume work obviates ADA and RHA concerns. See id. 49 C.F.R. § 40.160(c) allows the MRO to conduct alternative testing

18

when a negative test is required. Yet, a negative test result is not required for a random drug test and a cancelled test is sufficient to allow an employee to continue serving in safety-sensitive duties. See 49 C.F.R. § 40.193(i); 65 Fed. Reg. 79642-01, 79501. Section 40.160(c) is inapplicable to the testing procedures in § 40.193 on a cancelled test. The Defendant lacked authority to offer Plaintiff the accommodations he requested because to do so would have violated DOT regulations. Plaintiff's claims therefore fail as a matter of law.

As to whether Plaintiff is qualified to perform the requirements of serving as a school bus driver, an individual is qualified under the ADA and the RHA if he can perform essential functions of a position with or without reasonable accommodation. 42 U.S.C. § 12111(8). Plaintiff is required by DOT regulation to submit to random drug testing. (Docket Entry No. 38, Attachment No. 1, Compl. ¶ 3). As previously discussed, Plaintiff's failure to provide adequate sample forced MNPS to remove him from safety-sensitive duties. Plaintiff's test result also placed him out of compliance with DOT regulations and at the date of verification he was no longer qualified to serve as a bus driver. King v. Mrs. Grissom's Salads, Inc., 1999 WL 552512, at *2 (6th Cir. July 22, 1999) ("Compliance with DOT safety regulations is an essential function of the job for a commercial driver.").

Plaintiff correctly asserts that an employee can be disqualified in a discriminatory manner that will satisfy the ADA and the Rehabilitation Act. Kinneary v. City of New York, 601 F.3d 151, 156 (2d Cir. 2010) ("Terminating a disabled employee...who can perform the essential function of the job but cannot return to work because the employer has denied his request for reasonable accommodation is disability discrimination under the ADA.") (citations omitted). Here, however, the determination that Plaintiff was no longer qualified for safety-sensitive duties

19

was required by DOT regulation. 49 C.F.R. §§ 655.49(a), 655.61(a)(3). Plaintiff's request is also unreasonable to allow catheterization or alternative tests because these would also violate DOT regulation. See 49 C.F.R. §§ 40.61(b)(3), 40.151(a). Thus, Plaintiff's disqualification was therefore non-discriminatory. After the March 26, 2010 verification of his random drug test as a refusal to test, Plaintiff was not qualified to drive a school bus and his ADA and RHA claims fail as a matter of law.

To be reinstated, Plaintiff must complete his SAP training and pass a return to work drug test. 49 C.F.R. § 40.305(a)-(b). Plaintiff's contention that the return to work drug test will start a vicious cycle of constant inability to provide adequate samples and subsequent disqualification is unfounded. (Docket Entry No. 46, Plaintiff's Memorandum at 5-6). The return-to-work testing allows for alternative testing methods including clinical diagnosis of drug use as well as blood testing. 49 C.F.R. § 40.195(a)(3). Once returned to safety-sensitive duty, Plaintiff can be assured that his future "Shy Bladder" incidents will be verified as cancelled tests. Plaintiff's "Shy Bladder" syndrome is now a previously medically documented psychological disorder due to his evaluations with Drs. Wiatrak, Faber, and Heusinkveld. (Docket Entry No. 38, Attachment No. 3, Kracht Deposition at 37-38). In future random drug tests, Plaintiff's inability to provide an adequate sample will have an adequate medical explanation which will allow his future tests to be cancelled by the MRO. 49 C.F.R. § 40.193(i).

### III. Conclusion

For the reasons stated herein, the Defendant's motion for summary judgment (Docket Entry No. 38) should be granted in its entirety.

An appropriate Order is filed herewith.

20

**ENTERED** this the _____ day of August, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge